**UNITED STATES of America, Plaintiff-Appellee,**

v.

**James Orris NETTLES and Emory Robinson, Jr., Defendants-Appellants.**

**No. 77–5315.**

United States Court of Appeals, Fifth Circuit.

March 31, 1978.

Joseph M. Ripley, Jr., Jacksonville, Fla., (Court-appointed) for Nettles.

Giles P. Lewis, Jacksonville, Fla., for Robinson.

John L. Briggs, U. S. Atty., Manuel Menendez, Jr., Asst. U. S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before COLEMAN and FAY, Circuit Judges, and KING, District Judge.*

FAY, Circuit Judge:

Appellants James Orris Nettles and Emory Robinson, Jr. were indicted by a federal grand jury in Jacksonville, Florida, along with fifteen others. The indictment charged Robinson in Count One with conducting an illegal gambling business, in violation of 18 U.S.C. § 1955 (1970),[1] and in Count Four with conspiracy to obstruct

---

* James Lawrence King, District Judge for the Southern District of Florida, sitting by designation.

1. § 1955. Prohibition of illegal gambling businesses

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot

local law enforcement officials with the intent to facilitate the operation of the above mentioned illegal gambling business, in violation of 18 U.S.C. § 1511 (1970).[2] Nettles was charged in Count Two with conducting another illegal gambling business and in Count Five with conspiracy to obstruct local law enforcement officials with the intent to facilitate the operation of his alleged gambling enterprise.[3] Both Nettles and Robinson were convicted of the charges against them and were each sentenced to five years incarceration for the substantive offense and a consecutive five-year probationary term for the conspiracy charge.

The first trial of this case was against Nettles, Robinson, Saig, Claxton, Barrow and Olson. All of the other defendants had been severed. The trial terminated in a mistrial a week later.

Motions for severance were filed before the second trial and the court granted partial relief by severing defendant Olson due to adverse pretrial publicity involving him. During the second trial, the court denied all subsequent motions for severance. Defendants Nettles, Robinson, Saig, Barrow and Claxton were retried commencing on February 21, 1977. At the close of all the evidence, the court granted Saig's motion for judgment of acquittal on Counts Three and Six. The charges against Saig in Count Two had been dismissed on the

machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
    (3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

**2.** § 1511 Obstruction of State or local law enforcement
    (a) It shall be unlawful for two or more persons to conspire to obstruct the enforcement of the criminal laws of a State or political subdivision thereof, with the intent to facilitate an illegal gambling business if—
       (1) one or more of such persons does any act to effect the object of such a conspiracy;
       (2) one or more of such persons is an official or employee, elected, appointed, or otherwise, of such State or political subdivision; and
       (3) one or more of such persons conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business.
    (b) As used in this section—
       (1) "illegal gambling business" means a gambling business which—
          (i) is a violation of the law of a State or political subdivision in which it is conducted;
          (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
          (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
       (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels, or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

    (3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

**3.** The indictment specified the charges as follows:
    Counts One, Two and Three of the indictment alleged violations of 18 U.S.C. §§ 1955 and 2. Each of these first three counts charged that the defendants named therein conducted an illegal gambling business from on or about May 6, 1973, through and including September 8, 1973, in Duval County, in the Middle District of Florida. Counts Four, Five and Six alleged conspiracies under 18 U.S.C. § 1511. Each of the conspiracies was alleged to have occurred from on or about May 6, 1973, up to and including September 8, 1973, and prior thereto, the exact date being to the grand jury unknown. Each of the conspiracies was alleged to have occurred in Duval County, in the Middle District of Florida.
    The defendants charged in each of the respective counts were as follows:
Count One: Olson, Claxton, Barrow, Pace, McNair, Hughes, Bronner, Webb, Tunstall, Williams, Tinsley, Spanish, and Robinson.
Count Two: Olson, Claxton, Barrow, Abdullah, Lewis, Saig, and Nettles (also named in Count Two, but not indicted were Crisp Bennett and Billy Corbett).
Count Three: Olson, Claxton, Barrow, Abdullah, and Saig (also named in Count Three, but not indicted were Dean Stonier, Steven Paul, and William Haygood).
Count Four: Olson, Claxton, Barrow, and Robinson.
Count Five: Olson, Claxton, Barrow, and Nettles.
Count Six: Olson, Claxton, Barrow, and Saig.

government's motion prior to trial. Claxton and Barrow were convicted on all six counts. Robinson and Nettles were convicted on each of the two charges against them. Thereafter, the trial court denied Robinson's and Nettles' motions for new trials.

On appeal, Robinson and Nettles both contend that the trial court erred in denying their motions for severance on grounds of misjoinder under Fed.R.Crim.P. 8(b). Nettles further contends the trial court erred in ruling that his membership in the conspiracy in Count Five had been sufficiently established to allow the introduction of co-conspirators' hearsay testimony against him.

The charges in Counts Two and Five against Nettles revolved around an illegal gambling business operating at 3370 Old Kings Road, Jacksonville, Florida, which Nettles allegedly operated. The gambling included various forms of poker and a dice game. The amounts wagered were cut and money was set aside to compensate the operators of the game. The conspiracy charge alleged an agreement between Nettles and Officers Eugene Claxton, C. Norman Barrow, and Julius C. Olson, members of the Jacksonville Sheriff's Office, for Nettles to pay the police officers sums of money in return for protection against police raids on his establishment or, if unable to prevent them, for warnings against imminent police raids.

The charges against Robinson in Counts One and Four revolved around a gambling business operated by Robinson out of numerous locations in Jacksonville, Florida. Locations included were 753 West Duval Street, 823 West Duval Street, 527 West State Street, 912 West Beaver Street, 1349 Spearing Street, 1583 Bridier Street, and 7914 Smart Avenue. The gambling done at these locations consisted of a game known locally as "skin". The amounts wagered were cut and money was set aside to compensate the game's operators. The conspiracy count alleged an agreement between Robinson and the same police officers, Claxton, Barrow, and Olson, for the payment of sums of money to protect the operation of the skin game. Protection was given which helped avoid raids and, if unable to avoid them, to warn the participants of an imminent raid by the police.

Salem Saig, the third non-police defendant tried at the same time as Robinson and Nettles, allegedly operated a third gambling establishment at the Rivers Edge Apartments in Jacksonville. Saig, along with Claxton, Barrow and Olson, also was charged with conspiracy to obstruct state or local law enforcement. The trial court granted Saig a judgment of acquittal on both counts brought against him.

On May 7, 1973, Investigator Dennis B. Glasscock of the Jacksonville Sheriff's Office was approached by Barrow who proposed Glasscock join the gambling protection operation. Glasscock reported this proposition to the Federal Bureau of Investigation (FBI) and a full scale investigation began shortly thereafter and lasted through September 7, 1973. During the course of the investigation, Glasscock operated in an "undercover" capacity, pretending to join the scheme and at the same time reporting his activities to the FBI. His activities principally amounted to conversations and meetings with Barrow, Claxton, and Olson, during which the gambling operations were discussed and monies paid by each operation were divided.

Rule 8 of the Federal Rules of Criminal Procedure governs joinder of offenses and defendants in a single indictment. The issue before us is whether Robinson and Nettles were misjoined under Rule 8(b) [4] in the indictment and, therefore, at trial with each

---

4.  (b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

other and with Salem Saig, the alleged operator of the third gambling establishment.[5]

■ Misjoinder of defendants under Rule 8(b) is "inherently prejudicial" and, therefore, the granting of a motion for severance, where misjoinder is found, is mandatory and not within the discretion of the trial court. *United States v. Marionneaux,* 514 F.2d 1244, 1248 (5th Cir. 1975). A claim of misjoinder under Rule 8(b) is reviewable on appeal as a question of law. *United States v. Park,* 531 F.2d 754, 760 (5th Cir. 1976); *accord, United States v. Marionneaux,* 514 F.2d 1244, 1248 (5th Cir. 1975); *Tillman v. United States,* 406 F.2d 930, 933 n.5 (5th Cir. 1969), *vacated and remanded in part on other grounds,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).

Rule 8(b) requires that defendants participate "in the same series of acts or transactions". To make joinder proper, this court has held the rule requires a "substantial identity of facts or participants" between two offenses. *United States v. Marionneaux,* 514 F.2d at 1248–49.

■ In this case, Counts One, Two and Three should not have been charged in a single indictment. The requisite identity of facts or participants necessary for proper joinder is not present. Each count alleges the existence of a gambling enterprise with their sole connection being the presence of Claxton, Barrow and Olson.[6] Each of these substantive counts arose from a different set of facts. The three policemen were included in the indictment in each of the substantive counts because they allegedly facilitated the conduct of the three different gambling enterprises. The policemen aided the operation by causing police raids to be made upon competing gambling oper-

ations and by contributing to the bonds and attorneys' fees for bettors arrested in protected operations when raids could not be avoided. However, the benefits derived by each operation were from different actions by the indicted officers. The three police officers were also included in these three counts in hopes of meeting the federal statutory requirement of five persons to make an illegal gambling operation.[7]

When, as here, the connection between different groups is limited to a few individuals common to each but those individuals commit separate acts which involve them in separate offenses with no common aim, then the requisite substantial identity of facts or participants is not present. Therefore, we find Counts One, Two, and Three could not properly be joined under Rule 8(b).

With respect to Counts Four, Five and Six, we reach the same result. The indictment charged three separate conspiracies to obstruct state or local law enforcement with the intent to facilitate three separate illegal gambling businesses. If the evidence showed one large conspiracy with the three police officers as the hub, each of the three gambling businesses operated by Nettles, Robinson and Saig as the spokes, and some interaction between the operations to provide the rim, then the defendants could have been so indicted. However, "[f]or a wheel conspiracy to exist those people who form the wheel's spokes must have been aware and must do something in furtherance of some single, illegal enterprise". *United States v. Levine,* 546 F.2d 658, 663 (5th Cir. 1977). If not, there is no rim to enclose the spokes. *United States v. Levine,* 546 F.2d at 663. The absence of a rim

---

**5.** The three policemen, Claxton, Barrow and Olson, were charged in all six counts. Robinson and Nettles do not suggest Rule 8(b) requires separate trials from the policemen, only that the counts involving Robinson should have been tried at one trial and those involving Nettles in a separate trial.

**6.** The suggestion that because the operations existed during the same time period and each group of defendants were charged under the same statute then the requirements of Rule

8(b) were met is without merit. The time periods are the same because evidence of the operations began when the police investigation began and ended when the defendants were arrested.

To suggest that because defendants were charged under the same statute they should be joined is ludicrous and does not merit discussion.

**7.** See note 1.

was apparently noted when the indictment was drawn charging three separate conspiracies.

A careful review of the facts and the record shows these conspiracies, although similar, were not a "series" under Rule 8(b). There was no substantial identity of acts or participants between these alleged conspiracies. The involvement of the same police officers in each count does not provide the necessary relationship required by Rule 8(b). *See United States v. Marionneaux,* 514 F.2d 1244 (5th Cir. 1975), where defendants in parallel conspiracies with the same purpose and a mutual defendant were found to be improperly joined. Combining these three counts in one indictment contravenes Rule 8(b)'s requirements for proper joinder.

■ Combining in one indictment the three substantive counts with the three conspiracy counts does not remedy the misjoinder. Where a substantive count is within the scope of a conspiracy charged then their joinder is proper. *See United States v. Gentile,* 495 F.2d 626, 632 (5th Cir. 1974). That is the situation as to Counts One and Four, Counts Two and Five, and Counts Three and Six. However, there is no overlapping which would allow each of these three groups to then be joined under Rule 8(b).

These two appellants should not have been tried together. We reverse the convictions of both Robinson and Nettles. We remand Robinson to the district court for a new trial on Counts One and Four. As to Nettles, we remand to the district court for a new trial on Count Two but reverse the conviction under Count Five for the reasons discussed below.

Nettles' second assignment of error claims the government failed to sufficiently prove the existence of the conspiracy charged in Count Five and Nettles' membership in it. Therefore, error is claimed in admitting into evidence hearsay testimony of co-conspirator's statements. We agree. These hearsay statements were improperly admitted into evidence against Nettles. The evidence is insufficient as a matter of law to connect Nettles with the conspiracy.

■ Statements made outside the presence of a defendant are admissible as declarations of a co-conspirator made during the course and in furtherance of it when there is "proof *aliunde* of the existence of the conspiracy and of the defendant's connection with it. [Citations omitted]" *United States v. James,* 510 F.2d 546, 549 (5th Cir. 1975). To prove a conspiracy, "the proof may be circumstantial or direct or both, but it must convince beyond a reasonable doubt that a conspiracy existed, that the defendant knew it, and with that knowledge intentionally did some act or thing to further or carry on that conspiracy." *Causey v. United States,* 352 F.2d 203, 207 (5th Cir. 1965).

■ Viewing the evidence which was before the trial court in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we conclude there was not even slight evidence [8] to connect Nettles with the conspiracy.

Evidence against Nettles adduced at trial was limited to the testimony of three men who had been to the gambling establishment on Old Kings Road in Jacksonville, Florida. Dean Stonier was first. He testified that Nettles had invited him to the "junkyard", which was the nickname given the Old Kings Road establishment. Stonier went to the "junkyard" approximately once a week for three or four months during the summer of 1973. He sometimes played gin or shot "craps" but mostly played poker.

---

**8.** We have previously pointed out that "[o]ur adherence to the 'slight evidence' rule should make us nonetheless insistent that guilt remain 'individual and personal' and that the government show beyond a reasonable doubt that each and every alleged member of the conspiracy had the deliberate, knowing, specific intent to join the conspiracy. *United States v. Morado,* 454 F.2d 167, 175 (5th Cir.), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972)."

*United States v. Duckett,* 550 F.2d 1027, 1031 (5th Cir. 1977).

The games had a house dealer and part of the money bet was cut to pay the operators. Nettles, himself, apparently sold the poker chips used during the games. Stonier also indicated Nettles gambled at the "junkyard", put his money in the "pot" and was cut like all other bettors. Others he observed there on occasion were Bill Corbett, Crisp Bennett, and Milton Franklin Lewis who dealt the card games and Danny Abdullah who was the croupier at the dice table.

Next to mention Nettles in his testimony was Leo Lourcey. He admitted gambling at the "junkyard" once. He knew Nettles and during that one visit had purchased his poker chips for the evening from Nettles. A man named "Bill" and another cut the game.

Wayne Lourcey[9] testified that he went to the "junkyard" once and had learned of it from his brother, Gary. Of the two dealers he saw at the game, he knew only one's name—"Bill". The game was "cut". Wayne Lourcey saw Nettles at the "junkyard" the one time he was there and also at the game on River's Edge.

The hearsay testimony admitted against Nettles was that of Investigator Glasscock. It consisted of conversations Glasscock had with the police officers Claxton, Barrow and Olson and tapes of some of these conversations. These conversations mentioned Nettles as a payer of money for protection. In many instances the police officers gave money to Glasscock which they alleged was his share of payments from Nettles (and other games). The money Glasscock received was admitted into evidence at trial.

The only other evidence received were pieces of paper listing names with telephone numbers and sometimes addresses. The papers with Nettles listed included: 1) One seized from Olson at the time of his arrest with Nettles' name and phone number and the words "girl friend" (alleged by the government through Glasscock's hearsay testimony to be warning code words); 2) A list seized from Barrows' wallet upon

his arrest which had Nettles' name and phone number on it. (At the time Barrow was arrested he made a statement that he compiled this list for intelligence gathering purposes and the jury was instructed this statement was only evidence against Barrow); 3) A list which Barrow gave Glasscock with Nettles' name, phone number, alleged code words "girl friend coming" and "2 wk" next to it. (Hearsay testimony by Glasscock stated Barrow said Nettles was paying $200 per week.)

Also seized from the "junkyard" on September 7, 1973, when only Milton Franklin Lewis, a dealer, was present were decks of playing cards, a kidney shaped card table, some poker chips, a leather visor, a dice table and some dice. The FBI also found the telephone number to the Old Kings Road premises was the same as the one on the pieces of paper next to Nettles' name.

Nettles' counsel, during closing argument and in his appellate brief, does not deny Nettles' involvement in the gambling operation. However, he defended on the ground that five persons were not proven by the government to be involved as required by the federal statute. The jury apparently disagreed based on the testimony of Stonier and the two Lourceys and convicted Nettles on the substantive count. Had joinder been proper this conviction would stand. But, even though that same element, operating a gambling establishment, was proven by the same evidence as part of the conspiracy charge, the non-hearsay evidence offered to link Nettles to a conspiracy or agreement with the three police officers was virtually nonexistent. At most it is several pieces of paper with Nettles' name and telephone number on them. Without using any non-hearsay testimony to link Nettles to the conspiracy, this court finds a reasonably minded jury must necessarily entertain a reasonable doubt about Nettles' membership in that conspiracy. *United States v. Haggins*, 545 F.2d 1009 (5th Cir. 1977).

9. The record is not clear in describing the relationship between Leo Lourcey and Wayne Lourcey. However, we infer from several statements that Leo is Wayne's father.

For the foregoing reasons we find judgment of conviction on County Five cannot stand and judgment of acquittal should have been granted. With respect to the other convictions appealed, we reverse those of Emory Robinson and remand for a new trial. As to the remaining count against Nettles we reverse and remand for a new trial separate from that of Robinson.

Reversed and remanded.